# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 20-301V

* * * * * * * * * * * * * * * * * * * * * * * * *

LAURIANNE RUSSELL,                          *
                                            *
            Petitioner,                     *          Filed: January 2, 2026
                                            *
    v.                                      *
                                            *
SECRETARY OF HEALTH AND                     *
HUMAN SERVICES,                             *
                                            *
            Respondent.                     *
                                            *
* * * * * * * * * * * * * * * * * * * * * * * * *

*Leah V. Durant,* Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.

*J. Travis Williamson,* U.S. Department of Justice, Washington, DC, for Respondent.


### ENTITLEMENT DECISION[1]

Petitioner Laurianne Russell initially alleged the Table claim of shoulder injury related to vaccine administration ("SIRVA") due to an influenza ("flu") vaccine received on December 4, 2017. But I dismissed the Table claim on July 26, 2023, because Petitioner could not establish that her symptoms were localized to the vaccinated shoulder. Findings of Fact and Conclusions of Law, dated July 26, 2023 (ECF No. 35) (the "Table Dismissal"). The parties then filed expert reports (ECF Nos. 40 and 41) in support of a causation-in-fact version of the claim, and the matter had been set for hearing in February 2025. (ECF No. 49).

The parties subsequently indicated their willingness to resolve the matter via ruling on the record, and filed briefs in support of their positions. Petitioner's Brief on Entitlement, dated May 30, 2025 (ECF No. 61) ("Br."); Respondent's Brief in Support of Dismissal, dated May 30, 2025 (ECF No. 60) ("Opp."). Now, for the reasons set forth below, I deny entitlement.

---

[1] Under Vaccine Rule 18(b), each party has fourteen (14) days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public in its present form. *Id.*

I.      **Factual History**

Petitioner was fifty-two years old when she received a flu vaccine in her left shoulder on December 4, 2017. Ex. 1 at 1. She maintains that the "next day, my arm was so sore, I struggled to play my pool game." Ex. 7 at ¶2.

A little more than two weeks later (December 19, 2017), Petitioner saw Nurse Practitioner ("NP") Stephany Sipe at Pithadia Medical Professional Services in Valparaiso, Indiana, for medication refills and a check of her high blood pressure. Ex. 3 at 20–21. Although she now reported no generalized aches or pains, a physical exam revealed decreased range of motion ("ROM") on the left side of her neck, plus left-sided muscle spasms in her cervical sternocleidomastoid muscle. *Id*. The assessment included benign essential hypertension and "muscle spasm of cervical muscles of neck." *Id*. There was no mention of left shoulder pain at this visit in the relevant record, and no reports of pain or symptoms in the temporal interval since vaccination—although Petitioner contends she did at this time report shoulder pain, and was told to pursue conservative home treatment. Ex. 7 at ¶ 2.

In the following month (January 26, 2018), Petitioner saw NP Nicole Schultz at Urgent Care. Ex. 5 at 1–3. Petitioner complained of stiffness, plus persistent, aching pain in her left arm radiating to her neck since being vaccinated the month before. *Id*. She also now identified a small mass on her upper left arm at the vaccination site. *Id*. She also reported to NP Schultz that she had unsuccessfully tried self-treatment with a warm compress, and that she had also felt some numbness and tingling. *Id*. Exam revealed left shoulder tenderness (although ROM was not documented), and NP Schultz diagnosed Petitioner with left arm and neck pain and prescribed prednisone. *Id*.

Almost three months later (now April 30, 2018), Petitioner went to the emergency department at Franciscan Alliance Hospital reporting neck pain, and was seen by infectious disease specialist Dr. Daniel Smith. Ex. 4 at 4–11; Ex. 6 at 1–3. Dr. Smith noted that "almost [ten] years ago [petitioner] had a dissection of her artery in the left side of her neck [that] [led] to a temporary stroke [] much of which resolved." Ex. 6 at 1–3; Ex. 10 at 1–3. More recently, approximately six months ago (an inaccurate re recollection given the four-plus months since vaccination), Petitioner received a flu shot in the left arm and developed a nodule, and that "there seems to be a pulling from that area to the left side of her neck." Ex. 6 at 1. Petitioner also reported that the "shot area is inflamed now and it hurts," rating it an 8/10, and that "it is made worse when she turns to the right or tilts her head to the right stretching some of those neck muscles." *Id*. Exam revealed left-sided neck pain and throat pain. *Id*. Petitioner was deemed to be experiencing neck muscle spasms and prescribed medication. *Id*. In addition, an x-ray and MRI of the neck were ordered, but they yielded results consistent with the presence of degenerative disc disease. *Id*.; Ex. 3 at 31 (cervical x-ray revealing "multilevel facet joint arthrosis as well as "mild disc space narrowing…at multiple levels"); Ex. 4 at 16.

In mid-May 2018, Petitioner saw her primary care physician, Dr. Bharat Pithadia, at Pithadia Medical for left-sided neck pain and a reaction to the flu vaccine. Ex. 3 at 22–23. Petitioner again reported that she had pain in her left deltoid area since she received the vaccine on December 4, 2017. *Id*. at 22. She described "having a history of progressive pain that [had] been present in the left deltoid area … [that] go[es] up to the shoulder going up into the neck and also describe[d] shooting pain that goes towards her shoulder into the upper arm on the left side." *Id*.

An exam revealed tenderness of Petitioner's left trapezius and scapular region, decreased cervical rotation to the left, left shoulder abduction with pain, and trigger points on her left deltoid, and she was assessed with cervical radiculitis. Ex. 3 at 22. Dr. Pithadia also recognized Petitioner "does have slightly indurated area of the left deltoid" and "tenderness over the rhomboid area on the left scapular area." *Id*. In settling on a diagnosis of cervical radiculitis "for now," Dr. Pithadia acknowledged it may be "that what [petitioner] has suffered is going incidental in terms of her symptoms after the shot." *Id*.

Petitioner was prescribed magnesium chloride cream increase with an increased dose of gabapentin and referred to physical therapy ("PT"). Dr. Pithadia noted that there was "no impingement syndrome of the shoulder on the left side," but opined instead that Petitioner "may have developed the equivalent of regional sympathetic dystrophy type of syndrome[,] examination does to [sic] favor cervical radiculitis. It may have been that what she has suffered is going [sic] incidental in terms of her symptoms after the shot." *Id*. It was proposed that she be treated for cervical radiculitis. *Id*.

Petitioner began PT a few days later, at Southlake Rehab, LLC - Valparaiso ("Southlake Rehab"). Ex. 2 at 4–6. Her exam revealed limited ROM of the cervical spine with left radiating signs and symptoms, although she demonstrated shoulder flexion and abduction of "5-/5." *Id*. It was proposed that Petitioner attend PT three times a week for three weeks. *Id*.

On May 25, 2018, Petitioner returned to NP Sipe for treatment of neck pain. Ex. 3 at 24–25. She now reported that the day after she received a flu vaccine in her left deltoid, "she felt soreness that set into her neck and has been suffering from a sore neck for the past [six] months," and that she felt the vaccine explained her symptoms. *Id*. Exam revealed limited ROM in her neck, and it was noted that the April 2018 x-ray revealed the existence of degenerative disc disease in her neck. *Id*. at 24–25, 31–32. NP Sipe ordered another neck MRI, prescribed medication, and advised Petitioner to continue PT, with treater follow-up proposed once imaging had been obtained.

Approximately one month later (June 23, 2018), Ms. Russell was discharged from PT at Southlake Rehab having attended nine PT sessions. Ex. 2 at 18–20. After her sixth PT visit in early June, there was no more mention of shoulder concerns. *Id*. at 7. And by her seventh PT visit, on June 7, 2018, she was reporting that her neck pain and ROM was improved (with shoulder pain

said to be "almost gone. *Id*. at 9. At her last session, petitioner reported that she no longer had neck or shoulder pain. *Id*. at 11. Her cervical ROM had also improved significantly, and she met all of her goals. *Id*. Petitioner was instructed to continue her home exercise program. *Id*.

## II.    Expert Reports

### A.    Petitioner's Expert – Dr. Uma Srikumaran

Dr. Srikumaran is an orthopedic surgeon and academic, and he prepared three written reports for Petitioner. Report, dated November 10, 2023, filed as Ex. 11 (ECF No. 40-1) ("First Srikumaran Rep."); Report, dated June 17, 2024, filed as Ex. 31 (ECF No. 44-1) ("Second Srikumaran Rep."); Report, dated April 12, 2025, filed as Ex. 34 (ECF No.59-1) ("Third Srikumaran Rep.").

Dr. Srikumaran attended Johns Hopkins University School of Medicine in Baltimore, Maryland, where he earned his M.D., and completed his Internship and Residency in their Orthopedic Surgery department. Curriculum Vitae, dated Nov. 20, 2023, filed as Ex. 12 (ECF No. 40-2) at 1. Afterwards, he underwent a Fellowship at Harvard's Massachusetts General Hospital and Brigham and Women's Hospital, where he specialized in shoulder surgeries. *Id.* He is board certified by the American Board of Orthopaedic Surgery, a fellow of the American Academy of Orthopaedic Surgery, a fellow of the American Orthopaedic Association, and an Active member of the American Shoulder and Elbow Surgeons. *Id.* at 10, 16. Dr. Srikumaran currently serves as an Associate Professor at Johns Hopkins University School of Medicine's Department of Orthopedic Surgery, where he engages in clinical activities focusing on shoulder injuries and disorders. *Id.* at 9. He has published over thirty peer reviewed articles pertaining to his own research, and dozens of other shoulder injury publications. *Id.* at 2–6. Dr. Srikumaran sees roughly 2,500–3,000 patients a year for shoulder issues and performs hundreds of shoulder surgeries each year. First Srikumaran Rep. at 1.

*First Report*

Dr. Srikumaran began with a summary of Petitioner's relevant medical history. First Srikumaran Rep. at 2–4. Based on it, he concluded that the elements for a SIRVA claim (such as 48-hour post-vaccination onset) were met (despite my ruling a few months before that they were not). *Id.* at 5–6. He further reviewed the independent support for the association between mis-administered vaccines and shoulder injuries. *Id.* at 9.

Dr. Srikumaran acknowledged Petitioner's complaints of neck pain, but deemed them to be secondary to shoulder issues, or to reflect secondary pain that had radiated from the shoulder. First Srikumaran Rep. at 6. He also noted that "chronic degenerative conditions of both the

shoulder and the neck" were common, and thus cervical issues were not inconsistent with a primary shoulder issue. *Id.* at 6–7. In fact, there was independent evidence that treating shoulder pain could ameliorate associated neck pain "in the majority of cases." *Id.* at 8; S. Manifold & P. McCann, *Cervical Radiculitis and Shoulder Disorders,* Clin. Ortho. & Rel. Rs. 368, 105–13 (1999), filed as Ex. 28 (ECF No. 40-18) ("Manifold"), at 112 (noting the diagnostic challenge of differentiating shoulder from neck pain given their physical proximity, but that "the clinician must determine which site is the major contributor to the symptom complex and treatment should be directed at that site").

Otherwise, Dr. Srikumaran expressed doubt that Petitioner's overall presentation was consistent with a cervical radiculopathy. First Srikumaran Rep. at 8. He noted that Petitioner had displayed "tenderness to the left shoulder along with stiffness to the spine, neither of which are consistent with cervical spine pain," but instead looked to him like degenerative disease "symptomatically exacerbated" by the vaccine-caused SIRVA. *Id.* Objective findings specific to Petitioner's shoulder were made only after vaccination, and therefore "the presence of another condition" neither explained nor invalidated the SIRVA. *Id.*

*Second Report*

Dr. Srikumaran's second report reacted to the opinions offered in the first report of Respondent's expert, Dr. Geoffrey Abrams. But he reiterated the view (again—contrary to my determination from the summer of 2023, a year before this supplemental report was filed) that "Ms. Russell's case and symptoms support a SIRVA diagnosis and Table claim." Second Srikumaran Rep. at 3. He noted also that my Table claim ruling had found that Petitioner's onset met the first Table element. *Id.* at 1.

Regarding the evidence that could support a cervical spine-oriented injury over SIRVA, Dr. Srikumaran emphasized the extent the same records highlighted (especially while she was undergoing PT) shoulder issues, like ROM deficiencies, that implicate shoulder-specific problems over the neck. Second Srikumaran Rep. at 1. He invoked the "kinetic chain principle" (which "describes how the human body can be considered in terms of a series of interrelated links or segments") as helping to illustrate how "an injury to the shoulder can affect adjacent anatomic structures." *Id.* at 2 (*citing* T. Ellenbecker & R. Aoki, *Step By Step Guide to Understanding the Kinetic Chain Concept in the Overhead Athlete,* 13 Curr. Rev. in Musculoskel. Med. 155, 156 (2020), filed as Ex. 32 (ECF No. 45-1) ("Ellenbecker & Aoki"). Ellenbecker & Aoki, however, is specific to a narrow class of patients—"overhead athletes," like tennis players or baseball pitchers—rather than the more general population of individuals who experience shoulder and neck pain not attributable to repeated and vigorous arm movement. Ellenbecker & Aoki at 160 ("[a] review of the classic and more recent biomechanical studies *on the throwing motion and*

*tennis serve* demonstrates the important interaction between segments of the kinetic chain for optimal performance and injury prevention") (emphasis added).

This kind of interrelated, knock-on relationship between shoulder movement and secondary neck pain nevertheless applied here, Dr. Srikumaran contended. Vaccination in this case likely caused a "robust immune-mediated inflammatory response," and in turn shoulder pain attributable to that inflammation resulted in "compensation in the surrounding musculature" that secondarily caused pain and inflammation. Second Srikumaran Rep. at 2. Dr. Srikumaran also noted that literature he had referenced in his first report, like Manifold, established that successful treatment of shoulder concerns could ameliorate cervical spine/radiculopathy-like symptoms. *See generally* Manifold; *see also* R. Hawkins et al., *Cervical Spine and Shoulder Pain,* 258 Clin. Ortho. & Rel. Rs. 146 (Sept. 1990), filed as Ex. 22 (ECF No. 40-12) (proposing general clinical approach for differentiating neck and shoulder pain).

Dr. Srikumaran also attempted to identify evidence suggesting that (even if "the pain in the shoulder and neck occurred in close proximity") the shoulder pain predated neck pain. Second Srikumaran Rep. at 2. For example, at a January 2018 visit[2] with NP Schultz, it was noted that pain the arm was radiating to the neck, suggesting the former began before the latter. *Id.* at 3; Ex. 5 at 1. Even if neck/cervical spine symptoms later "overshadowed" Petitioner's shoulder complaints, they flowed from the vaccination. Second Srikumaran Rep. at 3. The symptoms Dr. Abrams deemed reflective of cervical myofascial pain syndrome would not have occurred but for the vaccine-instigated shoulder pain. *Id.*

*Third Report*

As explained in more detail below, although this matter had originally been set for hearing, the parties later agreed to resolve it via ruling on the record. Dr. Srikumaran's final written report endeavored to summarize his opinion.

Although Dr. Srikumaran did not again mention the legal elements of a SIRVA claim (which I had already found were not met), he repeated the view set forth in his prior reports—that "injection of the vaccine antigen close to Ms. Russell's left shoulder bursa caused her to suffer subacromial bursitis and synovitis." Third Srikumaran Rep. at 1. In effect, then, he continued to opine that Petitioner had experienced a SIRVA, regardless of my prior ruling, offering more independent support for the fact that a mis-administered vaccine could result in painful bursitis. *Id.* at 1–2. (Dr. Srikumaran did contend, however, that certain SIRVA elements, such as loss of ROM, did not need to be present for a finding of subacromial bursitis. *See, e.g.*, *id.* at 2).

---

[2] Dr. Srikumaran erroneously reported this medical encounter as having occurred on January 1, 2018, when in fact the actual exhibit notes it occurred on January *26*, 2018. Ex. 5 at 1.

Dr. Srikumaran also continued to attempt to explain away Petitioner's consistent (and arguably predominant) complaints of neck pain reflected in the medical record. He distinguished shoulder bursitis/synovitis from cervical-related conditions. Third Srikumaran Rep. at 2. In particular, cervical radiculopathy would likely feature complaints of arm pain, especially if below the elbow. *Id.* at 2–4*;* Y. Katsuura et al., *Overlapping, Masquerading, and Causative Cervical Spine and Shoulder Pathology: A Systematic Review,* 10 Global Spine J. 195–208 (2019), filed as Ex. 37 (ECF No. 59-4) ("Katsuura").

Katsuura is a literature review article that sought to assess "the relationship between the shoulder and the spine," regarding, among other things, a "cervical spine-based etiology for shoulder problems." Katsuura at 195. The article does remark that the existence of lower arm pain is "the most specific symptom that can differentiate [cervical radiculopathy] from a shoulder etiology"—and in Dr. Srikumaran's view, Petitioner's records (in particular from her PT sessions) were "more supportive of shoulder specific diagnoses," especially given the aim of her PT to help with reaching and stiffness. Third Srikumaran Rep. at 4. Petitioner's earliest complaints focused on the shoulder, even if pain "evolved to include cervical spine pain." *Id.* at 5. But Katsuura also observes that the "considerable overlap" between reported shoulder and cervical/neck pain makes it difficult to differentiate one from the other, obligating treaters to pursue a number of parallel approaches to properly diagnose an individual. Katsuura at 204, 205.

Thus, Katsuura does not suggest that the presence of neck pain can always, or even in most cases, be deemed secondary to shoulder concerns also observed. But Dr. Srikumaran maintained that any cervical pain complaints evident from the record were secondary to Petitioner's shoulder issues, and likely caused by them. Third Srikumaran Rep. at 5. He repeated his arguments about the "kinetic chain" principle as explanatory of how the two different pain situses were in fact related. *Id.*

B.    Respondent's Expert – Dr. Geoffrey Abrams

Like Dr. Srikumaran, Dr. Abrams is also an orthopedic surgeon and medical academic, and he prepared two written reports for Respondent. Report, dated February 1, 2024, filed as Ex. A (ECF No. 41-1) ("First Abrams Rep."); Report, dated April 12, 2025, filed as Ex. C (ECF No. 58-1) ("Second Abrams Rep.").

Dr. Abrams received a Bachelor of Arts in Human Biology, with a concentration in Neuroscience from Stanford University in 2000. Curriculum Vitae, dated Feb. 29, 2024, filed as Ex. B (ECF No. 41-15) ("Abrams CV") at 2. He received his medical degree from the University of California, San Diego before completing a surgical internship at Stanford University in 2008. *Id.* at 1–2. Dr. Abrams completed his residency at Stanford University Hospital and Clinics in 2012, and a fellowship at Rush University Medical Center in 2013. *Id*. at 1. Dr. Abrams is board

certified in Orthopedic Surgery with a subspeciality in Orthopedic Sports Medicine, and is licensed to practice medicine in Illinois and California. *Id.* at 2. He currently serves as an Associate Professor at the Stanford University School of Medicine in Stanford, CA, where he also serves as the head team physician for several of Stanford University's varsity teams and professional sports teams in the area. *Id.*; Abrams Rep. at 1. Throughout the course of his career, Dr. Abrams has published more than one hundred fifty peer reviewed publications on shoulder and other musculoskeletal pathology. Abrams CV at 2–16.

*First Report*

Consistent with Dr. Srikumaran's approach, Dr. Abrams performed his own review of Petitioner's relevant medical history. First Abrams Rep. at 2–3. He stressed the view that "many of the [P]etitioner's complaints are related to neck and neck muscle discomfort rather than symptoms which are typically associated with SIRVA." *Id.* at 3. He also observed the absence of imaging of Petitioner's shoulder—a missing testing element he felt was "unusual in a SIRVA" (since treaters would commonly order such testing if they felt it necessary), and suggested that Petitioner's treaters felt a "non-shoulder related pathology" more likely explanatory. *Id.* at 4. Dr. Abrams concluded that Petitioner's overall constellation of symptoms more likely reflected "cervical spine or neck muscle dysfunction—such as cervical myofascial pain syndrome or cervical spondylosis." *Id.*

In support, Dr. Abrams contended that the usual SIRVA elements were not evident in Petitioner's medical history. First Abrams Rep. at 4–5. Petitioner made no mention of shoulder issues at a December 19, 2017, treater visit, then first reported shoulder pain in January 2018—but at the same time reported neck pain that was consistent with "cervical spine mediated pathology." *Id.* at 4. Her April 2018 complaints of pain associated with movement of her head were also not reflective of a SIRVA. *Id.* Neck pain continued to be a significant reported issue (although Dr. Abrams allowed that pain in the left deltoid was also reported). *Id.* And treaters themselves favored a cervical radiculitis diagnosis over shoulder impingement. *Id.* at 5. By the time Petitioner began PT in the late spring of 2018 into that summer, the record revealed little concern for shoulder issues. *Id.*

Dr. Abrams instead favored a diagnosis of cervical pathology/cervical myofascial pain syndrome ("CMPS"), given the record. First Abrams Rep. at 5–6. Neck pain was a common complaint, especially in female patients. *Id.* at 5; G. Bovim et al., *Neck Pain in the General Population,* 19 Spine 1307–09 (1994), filed as Ex. A Tab 4 (ECF No. 41-6), at 1308 (Norwegian questionnaire study revealed more women than men experienced chronic neck pain). Cervical myofascial pain syndrome features "[p]ain attributed to muscle and its surrounding fascia within the cervical spine and neck area," and can occur idiopathically or due to overuse of the relevant muscles, or due to a compensatory reaction to some other spinal problem. J. Cooper, *Cervical*

*Myofascial Pain,* Medscape E-medicine (https://emedicine.medscape.com/article/305937-overview?form=fpf (last accessed Jan. 1, 2026), filed as Ex. A Tab 8 (ECF No. 41-9) ("Cooper I"). Cooper I notes the following symptoms for cervical myofascial pain:

> Cervical spine range of motion (ROM) is often limited and painful;

> The patient may describe a lumpiness or painful bump in the trapezius or cervical paraspinal muscles;

> Massage is often helpful, as is superficial heat;

> The patient's sleep may be interrupted because of pain;

> The cervical rotation required for driving is difficult to achieve;

> The patient *may describe pain radiating into the upper extremities, accompanied by numbness and tingling, making discrimination from radiculopathy or peripheral nerve impingement difficult;*

> Dizziness or nausea may be a part of the symptomatology; and

> The patient experiences typical patterns of radiating pain referred from trigger point.

Cooper I at 2 (emphasis added).

In this case, cervical spine x-rays performed on Petitioner in April 2018 revealed evidence of facet joint arthrosis and disc space narrowing. Ex. 3 at 31. She also was found in May 2018 to have left trapezius tenderness—one of the muscles "often implicated in myofascial pain." First Abrams Rep. at 6; Ex. 3 at 22. And Petitioner's neck-specific motion limits (observed at several treatment instances between December 2017 and May 2018) were far more consistent with cervical myofascial pain syndrome than SIRVA. First Abrams Rep. at 6. The same was true for the situs of the non-neck issues. *Id.*

Alternatively, Dr. Abrams maintained, Petitioner's presentation was consistent with cervical spondylosis. First Abrams Rep. at 6. Cervical spondylosis is a common, age-related condition attributable to wear and tear of the bones, cartilage, and discs in the neck, and features symptoms of neck pain and stiffness. G. Evans, *Identifying and Treating the Causes of Neck Pain,* 98 Med. Clin. N. Am. 645–61 (2014), filed as Ex. A Tab 10 (41-11) ("Evans"), at 647. The April 2018 x-ray had in his view confirmed the presence of cervical spine degeneration, and he deemed

that a "well-documented cause of neck and trapezius area pain." *Id.*; Evans at 647. In addition, cervical spondylosis is known to "lead to referred pain in the shoulder," (and thus Petitioner's neck issues could explain her shoulder complaints, rather than vice-versa as contended by Dr. Srikumaran). First Abrams Rep. at 6; N. Bogduk, *The Anatomy and Pathophysiology of Neck Pain,* 22 Phys. Med. Rehabil. Clin. N. Am. 367–82 (2011), filed as Ex. A Tab 11 (ECF No. 41-12), at 370 (discussing experiments confirming that stimulus to cervical region can result in "referred pain into the shoulder girdle and upper limb").

It was common in cases of cervical disease to report secondary shoulder issues, Dr. Abrams contended, and he noted that "over half of patients with cervical spondylosis . . . reported shoulder/lateral arm/deltoid pain in addition to neck/trapezius area pain." First Abrams Rep. at 6; G. Cooper et al., *Cervical Zygapophysial Joint Pain Maps,* 8 Pain Med. 344–53 (2007), filed as Ex. A Tab 12 (ECF No. 41-13) ("Cooper II"). Cooper II includes schematic images of head and upper body grids that show locations of pain associated with different cervical levels, and noted that more than half of patients suffering from cervical spondylosis at the C5/6 level (consistent with Petitioner's complaints) also reported "shoulder/lateral arm/deltoid pain in addition to neck/trapezius area pain." First Abrams Rep. at 6; Cooper II at 350 Fig. 9.

Dr. Abrams also addressed the possibility raised by Dr. Srikumaran that Petitioner's cervical-related issues could still have been vaccine-caused, even if the SIRVA elements were not met. First Abrams Rep. at 7. Dr. Srikumaran had invoked literature purportedly showing how shoulder issues could cause downstream neck pain. J. Gorski & L. Schwartz, *Shoulder Impingement Presenting as Neck Pain,* 85A J. Bone & Joint Surg. 635–38 (2003), filed as Ex. 21 (ECF No. 40-11) ("Gorski & Schwartz"), at 635 ("[i]n selected patients, chronic neck pain may be caused by shoulder impingement, which can be easily diagnosed with standard techniques," but noting that "the difficulty in making this diagnosis is that the patient presents with neck pain rather than with the typical shoulder pain"). But Gorski & Schwartz focused on a population of subjects who had a "positive impingement sign with pain referred to the neck" (Gorski & Schwartz at 636 (88 percent of 34-patient sample displayed "an immediately positive referred shoulder impingement test"))—a group that would not include Petitioner, who was found in May 2018 *not* to display evidence of impingement syndrome. First Abrams Rep. at 7; Ex. 3 at 22.

*Second Report*

After the parties had determined to resolve this claim on the papers rather than at hearing, I provided them with some questions about the claim, the answers to which I deemed central to the case's resolution. Order, dated February 19, 2025 (ECF No. 57) ("Scheduling Order"). Dr. Abrams attempted to address them, summarizing the contents of his earlier report. Second Abrams Rep. at 1.

Dr. Abrams reiterated his argument that records of Petitioner's treater encounters were consistent with a myofascial pain syndrome diagnosis, since she reported symptoms "more consistent with isolated neck pathology" than SIRVA. Second Abrams Rep. at 1. The testing and limited x-ray imaging performed also confirmed neck issues over shoulder. *Id.* at 2. Treaters did not favor a SIRVA-like explanation for Petitioner's symptoms (and never even ordered shoulder imaging). *Id.* And Dr. Abrams emphasized that Petitioner delayed initial treatment as well, and when she first sought professional help primarily complained of neck issues. *Id.*

Dr. Abrams also reacted to arguments contained in Dr. Srikumaran's second report. Dr. Srikumaran had maintained, for example, that neck pain was not reasonably associated with arm range of motion/reach issues, but Dr. Abrams proposed that this was incorrect. Second Abrams Rep. at 2; M. Constand & J. MacDermid, *Effects of Neck Pain on Reaching Overhead and Reading: A Case–Control Study of Long and Short Neck Flexion,* 5 BMC Sports Science, Med., and Rehab 1–6 (2013), filed as Ex. C Tab 3 (ECF No. 58-4), at 3 (observing differences in reaching task performance among small sample with neck issues versus healthy subjects). He agreed that the Petitioner had reported shoulder-associated pain (particularly during PT months after vaccination), but the cause of it (as well as the predominating neck pain) was more consistent with myfascial pain syndrome/cervical spondylosis than a SIRVA. Petitioner never displayed shoulder-associated ROM limits, and PT was aimed specifically at improving Petitioner's neck motion. Second Abrams Rep. at 3.

Another point raised in Dr. Srikumaran's second report was that Petitioner *did* display persistent shoulder pain, but Dr. Abrams opined that this had occurred in a limited timeframe (during her May to June 2018 PT sessions)—and that those same records established a cessation of shoulder pain, with subsequent focus on the neck. Second Abrams Rep. at 3. Dr. Srikumaran had also attempted to link Petitioner's shoulder and neck pain via the "kinetic chain" theory (which in turn would allow vaccination to have caused Petitioner's cervical myofascial pain syndrome). *Id.* Dr. Abrams recognized the theory's scientific validity, but deemed it more applicable to "overhead athletes such as baseball pitchers," who exert large force in the motion of their arm and shoulder) than to people engaged in activities of daily life. *Id.* (referencing Ellenbecker & Aoki). And other evidence purported to bulwark this linking explanation made no mention of the kinetic chain theory, or involved knee and hip pain not comparable to the facts of this case. Second Abrams Rep. at 3.

## III.    Procedural History

The matter was initiated in March 2020, and assigned to the "Special Processing Unit" ("SPU") since it asserted a SIRVA—a commonly-litigated (and often easily settled) Program claim. Efforts were made to settle the case both before and after Respondent filed his Rule 4(c) Report in October 2021 challenging entitlement. But the parties reached an impasse in the spring

of 2022, and thereafter I ordered Petitioner to show cause why the matter should not be dismissed, based upon the objections to entitlement set forth in the Rule 4(c) Report. Order, dated July 25, 2022 (ECF No. 30).

The parties briefed their positions, and I issued a Ruling in July 2023. *See* Table Dismissal. I determined therein that although Petitioner was able to meet the 48-hour onset requirement for a SIRVA, there was too much record evidence suggesting that her symptoms were not isolated to her shoulder to find an additional element was met, and I therefore dismissed the Table claim. *Id.* at 7–8. I ordered the matter transferred out of SPU so that it could be adjudicated as a causation-in-fact claim. *Id.* at 8.

The Petition was thus reassigned to my non-SPU docket,[3] and I invited the parties to obtain the expert reports discussed above. That process was completed by July 2024, and the parties initially planned to participate in a hearing so their experts could be heard live. However, in February 2025 they proposed instead that the matter be resolved on the papers, and I therefore set a ruling on the record schedule (which permitted them as well to file final supplemental reports). Scheduling Order at 2. Briefing was completed at the end of May, and the matter is now ripe for resolution.

## IV.    Parties' Arguments

*Petitioner*

Petitioner maintains that she has provided sufficient evidence to establish that her left shoulder subacromial bursitis and glenohumeral synovitis were caused-in-fact by the flu vaccine she received on December 4, 2017. Br. at 7–8. First, Petitioner holds that she has provided a credible and reputable medical theory demonstrating that the flu vaccine can cause SIRVA injuries and symptoms. *Id.* Relying on Dr. Srikumaran medical theory and expert reports, Petitioner's theory of causation relies on the mechanism of injury by the vaccine causing an inflammatory reaction in the subacromial/subdeltoid bursal space and the shoulder synovium (lining of the joint) resulting in bursitis/synovitis injury. *Id.* at 7–8, 15–17. After reviewing Petitioner's medical records, Dr. Srikumaran opined that Petitioner's shoulder diagnosis was consistent with shoulder bursitis with a rotator cuff tear. *Id.* at 7, 15–16 (citing Second Srikumaran Rep. at 3; Third Srikumaran Rep. at 4–5).

Second, Petitioner claims that she has shown a logical sequence of cause and effect between the vaccine and her injuries. Br. at 9. She argues that her medical documents show her pain began within forty-eight hours after vaccination, was initially localized in her upper left arm,

---

[3] The Chief Special Master oversees the SPU docket—and occasionally cases transferred from SPU are randomly reassigned to my personal docket.

and lasted for over six months—telltale signs of a vaccine caused injury in her opinion. *Id.* at 9–10. As further evidence of a vaccine caused injury, Petitioner points out that she consistently attributed her pain to her vaccine in her medical records. *Id.* at 9. This, Petitioner claims, is sufficient to satisfy a logical sequence of cause and effect.

Combating Respondent's claim that Petitioner's pain was fully explained by her cervical spondylosis, Petitioner states that only her shoulder pain began forty-eight hours after the vaccination at issue—not her neck pain. Br. at 10. In order to accept Respondent's theory, Petitioner argues that one must accept Petitioner's cervical spondylosis spontaneously caused both left shoulder and neck pain within forty-eight hours after vaccination. *Id.* While the record is silent as to when Petitioner's neck pain first began, Petitioner argues that medical records give an inference that her shoulder pain began before her neck pain, and all mentions of neck pain in records within forty-eight hours after vaccination was a result of the kinetic chain principle. *Id.* at 11–13, 18–20.

Third, Petitioner asserts that she has established a medically appropriate temporal association between the vaccine and her injury. Br. at 13. Petitioner holds that her pain began within forty-eight hours after vaccination, which was established in my Findings of Fact and echoed by Dr. Srikumaran's report. Table Dismissal at 7; *Id.* at 14 (citing Second Srikumaran Rep. at 5). Preponderant proof that this is a medically acceptable timeframe is evidenced by Petitioner's expert and supporting literature. Br. at 13 (citing First Srikumaran's Rep. at 9; L. Arias et al., *Risk of Bursitis and Other Injuries and Dysfunctions of the Shoulder Following Vaccinations*, 35 Vaccine 4870, 4873 tbl. 2 (2017), filed as Ex. 14 (ECF No. 40-4) ("Arias")). Arias is a large systematic review of post-vaccination shoulder injuries, and found a majority of the study group patients reported of pain from post-vaccination shoulder injury onset occurs within 48 hours. *Id.* (citing Arias at 4870, 4873 tbl. 2). Petitioner argues that the Arias article, coupled with Dr. Srikumaran's affirmative opinion, shows that Petitioner's post-vaccination injury onset was medically acceptable. *Id.* at 14.

*Respondent*

Respondent argues that Petitioner cannot meet the elements of a causation-in-fact claim. Opp. at 8–20. He begins by contending that Petitioner cannot establish the alleged shoulder-specific injury. Petitioner's injury is in fact inconsistent with shoulder bursitis and synovitis. *Id.* at 8. Petitioner's medical records did not show signs of positive impingement signs, pressure pain with overhead motions, nor decreased ROM—all hallmark signs of shoulder bursitis and synovitis. *Id.* at 8–9 (citing Ex. 2 at 4–6, Ex. 3 at 20–21, 22, 24–25). Rather, and as Dr. Abrams opined, the more likely etiologic explanation for Petitioner's symptoms was CMPS. *Id.* at 10 (citing First Abrams Rep. at 5). The symptoms of CMPS (implicating the trapezius and rhomboids muscles, and impacting cervical spine ROM) are found in Petitioner's medical records, further supporting

13

CMPS as a likely diagnosis over bursitis and synovitis. *Id.* at 11 (citing First Abrams Rep. at 6; Ex. 3 at 20–22; Ex. 6 at 1).

Second, Respondent argues that even if Petitioner establishes that she suffered from shoulder bursitis and synovitis, she has filed to satisfy her *Althen* requirements by a preponderance of the evidence. Opp. at 12–18. Petitioner's expert does not set forth a reliable medical theory or logical sequence of cause and effect between the vaccine and her injuries. *Id.* at 12–13. Respondent notes that Dr. Srikumaran claim that Petitioner's injury was directly caused by the vaccine administration likely due to poor mechanical technique inciting an inflammatory reaction was only supported by sources that did not conclude that injected antigens could cause bursa inflammation—only suggested its plausibility. *Id.* at 13 (citing First Srikumaran Rep. at 9 (advancing that Arias "surmis[ed] the cause to be an immune mediated response of inflammation related to antigens injected into the bursal tissue" and "suggesting the plausibility of inflammation caused by an immune mediated response to antigenic material")). Respondent argues that Petitioner has demonstrated a "plausible" or "possible" causal link between the flu vaccine and her injury, which is insufficient to meet her preponderance standard. *Id.*

Third, Respondent maintains that Petitioner has fallen short of satisfying her *Althen* prongs two and three showing, because she relies solely on *post hoc ergo propter hoc* logic while not grappling with evidence of other symptoms Petitioner was suffering from that do not align with a vaccine-induced shoulder injury. Opp. at 14–18. Notably, during the course of her treatment, Petitioner experienced reduction in ROM of the neck, tenderness of the left trapezius, and had diagnostic imaging that revealed fact joint arthrosis—all of which are typical of CMPS/cervical spondylosis. *Id.* at 14, 18. These findings, Respondent claims, were more suggestive of CMPS/cervical spondylosis rather than a shoulder injury, and do not align with Dr. Srikumaran's opinion on specific causation or appropriate temporal relationship. *Id.* at 14–18.

## V.    Applicable Legal Standards

### A.    *Petitioner's Overall Burden in Vaccine Program Cases*

To receive compensation in the Vaccine Program, a petitioner must prove either: (1) that she suffered a "Table Injury"—i.e., an injury falling within the Vaccine Injury Table—corresponding to one of the vaccinations in question within a statutorily prescribed period of time or, in the alternative, (2) that her illnesses were actually caused by a vaccine (a "Non-Table Injury"). *See* Sections 13(a)(1)(A), 11(c)(1), and 14(a), as amended by 42 C.F.R. § 100.3; § 11(c)(1)(C)(ii)(I); *see also Moberly ex rel. Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1320

(Fed. Cir. 2006).[4] Petitioner alleges a causation-in-fact claim, arising out of the same facts that were the basis for her now-dismissed Table claim.

For both Table and Non-Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof. Section 13(1)(a). That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly*, 592 F.3d at 1322 n.2; *see also Snowbank Enter. v. United States*, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Hum. Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991). In particular, a petitioner must demonstrate that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). A petitioner may not receive a Vaccine Program award based solely on her assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. Section 13(a)(1).

In attempting to establish entitlement to a Vaccine Program award of compensation for a Non-Table claim, a petitioner must satisfy all three of the elements established by the Federal Circuit in *Althen v. Sec'y of Health and Hum. Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005): "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury."

Each *Althen* prong requires a different showing. Under *Althen* prong one, petitioners must provide a "reputable medical theory," demonstrating that the vaccine received *can cause* the type of injury alleged. *Pafford*, 451 F.3d at 1355–56 (citations omitted). To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994). Such a theory must only be "legally probable, not medically or scientifically certain." *Id.* at 549.

Petitioners may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or a generally accepted medical theory. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1378–79 (Fed. Cir. 2009) (citing *Capizzano*, 440 F.3d at 1325–26). Special masters, despite their expertise, are not empowered by

---

[4] Decisions of special masters (some of which I reference in this ruling) constitute persuasive but not binding authority. *Hanlon v. Sec'y of Health & Hum. Servs.*, 40 Fed. Cl. 625, 630 (1998). By contrast, Federal Circuit rulings concerning legal issues are binding on special masters. *Guillory v. Sec'y of Health & Hum. Servs.*, 59 Fed. Cl. 121, 124 (2003), *aff'd* 104 F. App'x. 712 (Fed. Cir. 2004); *see also Spooner v. Sec'y of Health & Hum. Servs.*, No. 13-159V, 2014 WL 504728, at *7 n.12 (Fed. Cl. Spec. Mstr. Jan. 16, 2014).

statute to conclusively resolve what are essentially thorny scientific and medical questions, and thus scientific evidence offered to establish *Althen* prong one is viewed "not through the lens of the laboratorian, but instead from the vantage point of the Vaccine Act's preponderant evidence standard." *Id.* at 1380. Accordingly, special masters must take care not to increase the burden placed on petitioners in offering a scientific theory linking vaccine to injury. *Contreras v. Sec'y of Health & Hum. Servs.*, 121 Fed. Cl. 230, 245 (May 6, 2015) ("[p]lausibility . . . in many cases *may* be enough to satisfy *Althen* prong one" (emphasis in original)).

In discussing the evidentiary standard applicable to the first *Althen* prong, the Federal Circuit has consistently rejected the contention that it can be satisfied merely by establishing the proposed causal theory's scientific or medical *plausibility*. *See Cerrone v. Sec'y of Health & Hum. Servs.*, 146 F.4th 1113, 1121 (Fed. Cir. 2025) (petitioner's contention that *Althen* prong one requires only a showing of plausibility "understates the burden [a petitioner] bears under the first factor in the *Althen* formulation"); *Kalajdzic v. Sec'y of Health & Hum. Servs.*, No. 2023-1321, 2024 WL 3064398, at *2 (Fed. Cir. June 20, 2024) (arguments "for a less than preponderance standard" deemed "plainly inconsistent with our precedent" (*citing Moberly*, 592 F.3d at 1322)); *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019); *see also Howard v. Sec'y of Health & Hum. Servs.*, 2023 WL 4117370, at *4 (Fed. Cl. May 18, 2023) ("[t]he standard has been preponderance for nearly four decades"), *aff'd*, 2024 WL 2873301 (Fed. Cir. June 7, 2024) (unpublished). And petitioners always have the ultimate burden of establishing their *overall* Vaccine Act claim with preponderant evidence. *W.C. v. Sec'y of Health & Hum. Servs.*, 704 F.3d 1352, 1356 (Fed. Cir. 2013) (citations omitted); *Tarsell v. United States*, 133 Fed. Cl. 782, 793 (2017) (noting that *Moberly* "addresses the petitioner's overall burden of proving causation-in-fact under the Vaccine Act" by a preponderance standard).

The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Andreu*, 569 F.3d at 1375–77; *Capizzano*, 440 F.3d at 1326; *Grant v. Sec'y of Health & Hum. Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992). In establishing that a vaccine "did cause" injury, the opinions and views of the injured party's treating physicians are entitled to some weight. *Andreu*, 569 F.3d at 1367; *Capizzano*, 440 F.3d at 1326 ("medical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury'") (quoting *Althen*, 418 F.3d at 1280). Medical records are generally viewed as particularly trustworthy evidence, since they are created contemporaneously with the treatment of the patient. *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Medical records and statements of a treating physician, however, do not *per se* bind the special master to adopt the conclusions of such an individual, even if they must be considered and carefully evaluated. Section 13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment,

test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Hum. Servs*., 88 Fed. Cl. 706, 746 n.67 (2009) ("there is nothing . . . that mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted"). As with expert testimony offered to establish a theory of causation, the opinions or diagnoses of treating physicians are only as trustworthy as the reasonableness of their suppositions or bases. The views of treating physicians should be weighed against other, contrary evidence also present in the record—including conflicting opinions among such individuals. *Hibbard v. Sec'y of Health & Hum. Servs.*, 100 Fed. Cl. 742, 749 (2011) (not arbitrary or capricious for special master to weigh competing treating physicians' conclusions against each other), *aff'd*, 698 F.3d 1355 (Fed. Cir. 2012); *Veryzer v. Sec'y of Dept. of Health & Hum. Servs.*, No. 06-522V, 2011 WL 1935813, at *17 (Fed. Cl. Spec. Mstr. Apr. 29, 2011), *mot. for review den'd*, 100 Fed. Cl. 344, 356 (2011), *aff'd without opinion*, 475 F. Appx. 765 (Fed. Cir. 2012).

The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. That term has been equated to the phrase "medically-acceptable temporal relationship." *Id.* A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation." *de Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). The explanation for what is a medically acceptable timeframe must align with the theory of how the relevant vaccine can cause an injury (*Althen* prong one's requirement). *Id.* at 1352; *Shapiro v. Sec'y of Health & Hum. Servs.*, 101 Fed. Cl. 532, 542 (2011), *recons. den'd after remand*, 105 Fed. Cl. 353 (2012), *aff'd mem.*, 503 F. Appx. 952 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Hum. Servs.*, No. 11-355V, 2013 WL 3214877 (Fed. Cl. Spec. Mstr. May 30, 2013), *mot. for rev. den'd* (Fed. Cl. Dec. 3, 2013), *aff'd*, 773 F.3d 1239 (Fed. Cir. 2014).

### B.    *Legal Standards Governing Factual Determinations*

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. Section 11(c)(2). The special master is required to consider "all [ ] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as the "results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." Section 13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs*., 3 F.3d 415, 417 (Fed. Cir. 1993) (determining that it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination

is evidenced by a rational determination).

As noted by the Federal Circuit, "[m]edical records, in general, warrant consideration as trustworthy evidence." *Cucuras*, 993 F.2d at 1528; *Doe/70 v. Sec'y of Health & Hum. Servs.*, 95 Fed. Cl. 598, 608 (2010) ("[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), *aff'd*, *Rickett v. Sec'y of Health & Hum. Servs.*, 468 F. App'x 952 (Fed. Cir. 2011) (non-precedential opinion). A series of linked propositions explains why such records deserve some weight: (i) sick people visit medical professionals; (ii) sick people attempt to honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Hum. Servs.*, No. 11–685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013); *Cucuras v. Sec'y of Health & Hum. Servs.*, 26 Cl. Ct. 537, 543 (1992), *aff'd*, 993 F.2d at 1525 (Fed. Cir. 1993) ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms").

Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03–1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). Indeed, contemporaneous medical records are often found to be deserving of greater evidentiary weight than oral testimony—especially where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Hum. Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992), *cert. den'd*, *Murphy v. Sullivan*, 506 U.S. 974 (1992) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947) ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")).

However, the Federal Circuit has also noted that there is no formal "presumption" that records are accurate or superior on their face to other forms of evidence. *Kirby v. Sec'y of Health & Hum. Servs.,* 997 F.3d 1378, 1383 (Fed. Cir. 2021). There are certainly situations in which compelling oral or written testimony (provided in the form of an affidavit or declaration) may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Hum. Servs.*, 69 Fed. Cl. 775, 779 (2006) ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("[w]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent") (quoting *Murphy*, 23 Cl. Ct. at 733)). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. *Andreu*, 569 F.3d at 1379; *Bradley v. Sec'y of*

*Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

When witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez*, 2013 WL 1880825, at *3 (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203–04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). In making a determination regarding whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at hearing, there must be evidence that this decision was the result of a rational determination. *Burns*, 3 F.3d at 417.

C.    *Analysis of Expert Testimony*

Establishing a sound and reliable medical theory often requires a petitioner to present expert testimony in support of her claim. *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1361 (Fed. Cir. 2000). Vaccine Program expert testimony is usually evaluated according to the factors for analyzing scientific reliability set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594–96 (1993). *See Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1339 (Fed. Cir. 2010) (citing *Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999). Under *Daubert*, the factors for analyzing the reliability of testimony are:

(1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards for controlling the error; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Terran*, 195 F.3d at 1316 n.2 (citing *Daubert*, 509 U.S. at 592–95).

In the Vaccine Program the *Daubert* factors play a slightly different role than they do when applied in other federal judicial settings, like the district courts. Typically, *Daubert* factors are employed by judges (in the performance of their evidentiary gatekeeper roles) to exclude evidence that is unreliable or could confuse a jury. By contrast, in Vaccine Program cases these factors are used in the *weighing* of the reliability of scientific evidence proffered. *Davis v. Sec'y of Health &*

*Hum. Servs.*, 94 Fed. Cl. 53, 66–67 (2010) ("uniquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect to persuasiveness of expert testimony already admitted"). The flexible use of the *Daubert* factors to evaluate the persuasiveness and reliability of expert testimony has routinely been upheld. *See, e.g.*, *Snyder*, 88 Fed. Cl. at 742–45. In this matter (as in numerous other Vaccine Program cases), *Daubert* has not been employed at the threshold, to determine what evidence should be admitted, but instead to determine whether expert testimony offered is reliable and/or persuasive.

Respondent frequently offers one or more experts in order to rebut a petitioner's case. Where both sides offer expert testimony, a special master's decision may be "based on the credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1347 (Fed. Cir. 2010) (citing *Lampe*, 219 F.3d at 1362). However, nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Snyder*, 88 Fed. Cl. at 743 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 146 (1997)); *see also Isaac v. Sec'y of Health & Hum. Servs.*, No. 08–601V, 2012 WL 3609993, at *17 (Fed. Cl. Spec. Mstr. July 30, 2012), *mot. for review den'd*, 108 Fed. Cl. 743 (2013), *aff'd*, 540 F. App'x. 999 (Fed. Cir. 2013) (citing *Cedillo*, 617 F.3d at 1339). Weighing the relative persuasiveness of competing expert testimony, based on a particular expert's credibility, is part of the overall reliability analysis to which special masters must subject expert testimony in Vaccine Program cases. *Moberly*, 592 F.3d at 1325–26 ("[a]ssessments as to the reliability of expert testimony often turn on credibility determinations"); *see also Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1250 (Fed. Cir. 2011) ("this court has unambiguously explained that special masters are expected to consider the credibility of expert witnesses in evaluating petitions for compensation under the Vaccine Act").

D.    *Consideration of Medical Literature*

Both parties filed medical and scientific literature in this case, but not all such items factor into the outcome of this decision. While I have reviewed all the medical literature submitted, I discuss only those articles that are most relevant to my determination and/or are central to Petitioner's case—just as I have not exhaustively discussed every individual medical record filed. *Moriarty v. Sec'y of Health & Hum. Servs.*, No. 2015–5072, 2016 WL 1358616, at *5 (Fed. Cir. Apr. 6, 2016) ("[w]e generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision") (citation omitted); *see also Paterek v. Sec'y of Health & Hum. Servs.,* 527 F. App'x 875, 884 (Fed. Cir. 2013) ("[f]inding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered").

E.    *Determination of Claim on Basis of Record*

I have opted to decide entitlement in this case based on written submissions and evidentiary filings, including the expert reports filed by each side. The Vaccine Act and Rules not only contemplate but encourage special masters to decide petitions on the papers rather than via evidentiary hearing, where (in the exercise of their discretion) they conclude that the former means of adjudication will properly and fairly resolve the case. Section 12(d)(2)(D); Vaccine Rule 8(d). The choice to do so has been affirmed on appeal. *See D'Toile v. Sec'y of Health & Human Servs.*, No. 15-85V, 2018 WL 1750619, at *2 (Fed. Cir. Apr. 12, 2018); *see also Hooker v. Sec'y of Health & Human Servs.*, No. 02-472V, 2016 WL 3456435, at *21 n.19 (Fed. Cl. Spec. Mstr. May 19, 2016) (citing numerous cases where special masters decided on the papers in lieu of hearing and that decision was upheld). I am simply not required to hold a hearing in every matter, no matter the preferences of the parties. *See Hovey v. Sec'y of Health & Human Servs.*, 38 Fed. Cl. 397, 402–03 (1997) (special master acted within his discretion in denying evidentiary hearing); *Burns*, 3 F.3d at 417.

## ANALYSIS

Although this claim began as a SIRVA Table matter, Petitioner's undeniable non-shoulder-specific symptoms rendered that version of the claim untenable. What remains is a causation-in-fact claim: that Petitioner's receipt of a flu vaccine in early December 2017 caused left shoulder subacromial bursitis and glenohumeral synovitis. Br. at 3. Respondent, in reaction, contends Petitioner suffered from cervical myofascial pain syndrome or cervical spondylosis, and that it was not likely vaccine-caused. Opp. at 8–12.

*Petitioner did Not Likely Suffer from Subacromial Bursitis*

The record preponderates in favor of the cervical myofascial pain syndrome diagnosis proposed by Dr. Abrams, over a diagnosis of bursitis. As literature filed in this case establishes, CMPS is a chronic condition characterized by pain in the immediately-affected upper extremity locations, plus "referred" pain elsewhere (shoulder, back, face and neck). It is attributable to pressure on trigger points at the muscles and the fascia (tissues holding muscles in place). Although it can be caused by repeated muscle strain or motion repetition, it also is often idiopathic in origin. Cooper I at 3; J. Touma et al., *Cervical Myofascial Pain*¸ StatPearls (Jul. 3, 2023), https://www.ncbi.nlm.nih.gov/books/NBK507825/ (last accessed Jan. 1, 2026), filed as Ex. A Tab 9 (ECF No. 41-10) at 1–2.

Dr. Abrams persuasively referenced numerous aspects of the medical record supporting this proposed diagnosis. Petitioner's initial complaints of pain in mid-December 2017 were not related to her shoulder, but instead specific to her neck or left side overall. Ex. 3 at 20–21. She later complained of stiffness and shoulder pain she *thought* was vaccine-associated, but continued to report neck pain equally. Ex. 5 at 1–3. Neck pain was then the primary concern in April 2018, when Petitioner sought emergency care. Ex. 6 at 1–3; Ex. 10 at 1–3. And her PT was oriented more toward neck pain amelioration. Ex. 2 at 4–6, 9, 18–20; Ex. 3 at 24–25, 31–32. Treaters also did not seem to view Petitioner's injury as bursitis or something like a SIRVA, and did not even propose imaging that would have focused on shoulder edema or degenerative conditions. This fact pattern is far more consistent with myofascial pain syndrome.

Dr. Srikumaran, by contrast, did not persuasively establish that Petitioner likely experienced subacromial bursitis (in effect, a SIRVA). While his general point—that initial trauma to the shoulder that is common to SIRVA *could* possibly result secondarily in radiating pain to the neck—was reasonable and has medical support, this does not mean that *in every case* where neck and shoulder pain are both reported, the neck pain is invariably secondary. Rather, as in any case, the totality of the medical and other evidence is what matters, and what it best suggests will help resolve if the non-shoulder pain is incidental to SIRVA or supports a different injury. Here, the latter is the case. And Dr. Srikumaran's argument that Petitioner's neck issues could be viewed as evidence of a "kinetic chain," downstream from initial shoulder symptoms, was shown by Dr. Abrams not likely to be applicable outside the context of individuals like athletes, who put uncommon amounts of strain on their shoulders. *See generally* Ellenbecker & Aoki.

My dismissal of Petitioner's original SIRVA claim *could* have been overcome had I resolved the fact issue specific to whether her symptoms were primarily isolated to her shoulder in her favor. In many cases, petitioners can demonstrate that neck pain concerns were either transient or incidental to efforts aimed at treating shoulder pain. But having reviewed expert input on this question, I deem my initial determination to have been preponderantly supported. *This record* supports the conclusion that Petitioner's injury was more likely than not neck pain-specific, and thus more consistent with Dr. Abrams's proposed diagnosis.

*Petitioner Did Not Satisfy the Althen Prongs*

Petitioner has also not preponderantly shown that the injury she did experience could be caused by the flu vaccine. Rather, Dr. Srikumaran offered arguments that claimed that the *SIRVA* elements were met, and that neck pain Petitioner clearly experienced (and which ultimately predominated her treatment) was secondary to her shoulder issues. Second Srikumaran Rep. at 2–3. Indeed, even after the case fell out of SPU, Dr. Srikumaran continued to make arguments that only had relevance in a SIRVA context. *See, e.g.*, *id.* at 3. He thus effectively offered little to no argument at all that receipt of the flu vaccine could cause a different kind of injury.

Similarly, Petitioner in her brief argued that she satisfied her requisite *Althen* showing by a preponderance of the evidence. But she only offered arguments for general causation, specific causation, and medically appropriate timeframe for her SIRVA and symptoms of left shoulder subacromial bursitis and glenohumeral synovitis. *See* Br. at 7–8. Relying on Dr. Srikumaran's medical theory and expert reports, Petitioner's theory of causation relies on the mechanism of injury by the vaccine causing an inflammatory reaction in the subacromial/subdeltoid bursal space and the shoulder synovium (lining of the joint) resulting in bursitis/synovitis injury. *Id.* at 7–8, 15–17.

Petitioner did not offer a causation theory in which a vaccine could trigger myofascial pain syndrome, or even something else that mainly manifested as neck pain/discomfort with subsequent secondary impacts (like restrictions on neck-straining movement). Thus, Petitioner has not preponderantly established that the kind of vaccine misadministration that the Program recognizes can result in a SIRVA could *instead* cause the kind of injury Petitioner more likely than not experienced. This claim, therefore, fails on the first *Althen* prong—a sufficient basis for the Petition's dismissal. *Dobrydnev v. Sec'y of Health & Hum. Servs.*, 566 Fed. Appx. 976, 980 (Fed. Cir. 2014).

## CONCLUSION

Because Petitioner did not carry her preponderant burden of showing causation, I am compelled to deny compensation.

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court **SHALL ENTER JUDGMENT** in accordance with the terms of this Decision.[5]

**IT IS SO ORDERED.**

/s/ Brian H. Corcoran
Brian H. Corcoran
Chief Special Master

---

[5] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment if (jointly or separately) they file notices renouncing their right to seek review.